UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

JAMES TODD PHILLIPS AND
SHELLY M. PHILLIPS,                                                       CASE NO. 08-02325-NPO

DEBTORS.                                                                          CHAPTER 7

WHITNEY NATIONAL BANK, SUCCESSOR VIA MERGER
WITH PARISH NATIONAL BANK                                         PLAINTIFF

V.                                                                                         ADV. PROC. NO. 09-00033-NPO

JAMES TODD PHILLIPS AND SHELLY M. PHILLIPS          DEFEDANTS

MEMORANDUM OPINION
DISMISSING ADVERSARY COMPLAINT

On October 18, 2010, this matter came on for trial (the "Trial") on the Complaint to Determine Dischargeability of Debt (11 U.S.C. §§ 523(A)(2)[1], (4) and (6)) (the "Adversary Complaint") (Adv. Dkt. No. 1), filed by Whitney National Bank, Successor via Merger with Parish National Bank (the "Bank"), and the Defendants' Answer to the Complaint (the "Answer"), filed by James Todd Phillips ("Todd Phillips") and Shelly M. Phillips ("Shelly Phillips"), the Defendants ("Phillipses") in this adversary proceeding (the "Adversary"). In this Adversary, the Bank is represented by Darryl T. Landwehr and Jeffrey R. Barber. The Phillipses are represented by David L. Lord. At the close of the Bank's case-in-chief, the Phillipses moved for a dismissal of the Adversary Complaint, asserting that the Bank had not borne its burden of proof. The Court, having

---

[1] While the Adversary Complaint asserts a claim under § 523(a)(2), it appears that the Bank abandoned that claim as it was not discussed in the Joint Pre-trial Order (Adv. Dkt. No. 64), nor was it developed at Trial. To the extent such relief was requested, the Court denies same for failure to prosecute.

considered the pleadings and the testimony and evidence at Trial, found that the Phillipses' *ore tenus* Motion to Dismiss Adversary Complaint was well-taken and granted. The Adversary was taken under advisement for the purpose of preparing this written opinion.[2] The Adversary Complaint should be dismissed with prejudice by separate order of the Court.

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I). Notice of the Trial was proper under the circumstances.

## Facts

### I. Stipulated Facts

The parties presented the following stipulated facts ("Stipulated Facts")[3] in the Joint Pre-trial Order:

1. On September 2, 2003, the Phillipses entered into a Construction Loan Agreement ("Riverwalk Loan Agreement") (Bank Ex. 1) with the Bank for the purpose of obtaining financing to purchase a lot and build a house on the real property bearing the municipal address of 141 Riverwalk (Lot No. 9), Madisonville, Louisiana (the "Riverwalk Property").

2. Under the terms of the Riverwalk Loan Agreement, the Bank agreed to make loans to the Phillipses on a non-revolving basis, in the aggregate principal amount of $800,000 to be

---

[2] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 7052.

[3] The Court has edited, simplified, and standardized some of the language from the Joint Pre-trial Order for consistency with the rest of the Memorandum Opinion. The definitions herein are the Court's.

evidenced by and payable in accordance with promissory notes to be executed by the Phillipses in favor of the Bank.

3. As security for the loans, on September 2, 2003, the Phillipses executed a Collateral Mortgage Note (Bank Ex. 2), payable on demand at the Bank, in the principal amount of $2,000,000.

4. The Collateral Mortgage Note was secured by a Collateral Mortgage[4] (Bank Ex. 3), also dated September 2, 2003, whereby the Phillipses mortgaged the Riverwalk Property to the Bank.

5. On September 2, 2003, the Phillipses also executed a Security Agreement (Bank Ex. 4) for the stated purpose of "securing payment of any and all obligations of the Phillipses to the Bank then existing or thereafter arising."

6. The Collateral Mortgage was recorded by the Bank in the mortgage records of St. Tammany Parish, State of Louisiana ("St. Tammany Parish"), on September 4, 2003, under instrument number 1390136.

7. On September 2, 2003, the Bank lent $800,000 to the Phillipses to purchase and build a house on the Riverwalk Property (the "Riverwalk Loan"). The Riverwalk Loan was evidenced by a Master Note (Bank Ex. 5) in the principal amount of $800,000, made payable to the Bank, and dated September 2, 2003.

8. On April 22, 2005, the Bank renewed the Master Note for $800,000. The renewal of the Master Note was evidenced by a promissory note ("Riverwalk Promissory Note") (Bank Ex. 6) executed by the Phillipses and made payable to the Bank.

---

[4] Under Louisiana law, a "[collateral] mortgage does not directly secure an existing debt, but is designed to create a mortgage note for a fictitious debt that can be pledged as collateral security for a real debt." Texas Bank of Beaumont v. Bozorg, 457 So. 2d 667, 671 (La. 1984).

9. The Riverwalk Promissory Note was secured by the pledge of the Collateral Mortgage Note to the Bank.

10. On July 14, 2005, the Phillipses executed a Business Loan Agreement (Bank Ex. 7) with the Bank for the purpose of seeking another loan in the amount of $303,000 (the "Business Loan").

11. On July 14, 2005, the Phillipses obtained the Business Loan from the Bank for $303,000, which was evidenced by a promissory note ("Business Promissory Note") (Bank Ex. 8), executed by the Phillipses and made payable to the Bank.

12. In connection with the Business Loan evidenced by the Business Promissory Note, the Phillipses also executed an Acknowledgement of Existing Multiple Indebtedness Mortgage (Bank Ex. 10) on July 14, 2005, in which they acknowledged the Collateral Mortgage and pledged the Riverwalk Property as collateral to secure the Business Loan and all other present and future indebtedness of the Phillipses to the Bank.

13. On March 7, 2006, the Phillipses sold the Riverwalk Property to David Briggs, Jr. and Carolyn Briggs (the "Briggses") for $2,000,000.

14. At the time of the closing of the sale of the Riverwalk Property (the "Riverwalk Closing"), the balance due to the Bank on the Construction Loan was $799,814.12, and the balance due on the Business Loan was $313,117.50.

15. The sales proceeds ("Proceeds") from the Riverwalk Property were applied as follows:

    (a) settlement charges of some $100,337.50;

    (b) property taxes of $4,597.92 for the year 2005;

  (c)  prorated property taxes through March 7, 2006 of $831.40;

  (d)  $799,814.12 to the Bank in satisfaction of the Riverwalk Loan; and

  (e)  $1,095,219.06 to the Phillipses.

16. The Phillipses did not remit to the Bank the balance due on the Business Loan from the Proceeds.

17. On March 7, 2006, the Phillipses utilized a portion of the Proceeds, approximately $375,000, to purchase a house at 1004 Hickory Avenue, McComb, Mississippi (the "McComb House").

**II. Facts Developed in Bank's Case-in-Chief**

The exhibits and credible testimony established the following facts at the Trial:

1. The Riverwalk Loan Agreement designates Todd Phillips and Shelly Phillips as "Borrowers" and Todd Phillips's business, Todd Phillips Investments, Inc. ("TPI"), as "Guarantor" for the Riverwalk Loan. (Bank Ex. 1)

2. The Riverwalk Promissory Note states that it is "secured by. . . real property in ST TAMMANY PARISH Parish [sic], State of Louisiana. Collateral securing other loans with Lender may also secure this Note as the result of cross-collateralization." (Bank Ex. 6)

3. The Business Loan Agreement expressly states that the purpose of the loan is for "operating capital." Additionally, under the "Affirmative Covenants- Loan Proceeds" section, the Business Loan Agreement states that the loan proceeds shall be used "solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing." (Bank Ex. 7)

4. The Business Promissory Note states that it is "secured by. . . real property located in St Tammanyh [sic] Parish, State of Louisiana. Collateral securing other loans with Lender may also

secure this Note as the result of cross-collateralization." (Bank Ex. 8)

5. In addition to the Riverwalk Loan and the Business Loan, the Bank also made a loan to TPI in the amount of $356,000, on October 28, 2005, for the purpose of purchasing and building on commercial property (the "Lakeview Loan"). The Lakeview Loan was evidenced by a Multiple Indebtedness Mortgage ("Lakeview Mortgage") (Bank Ex. 27) and a promissory note ("Lakeview Note") (Bank Ex. 28). The Lakeview Mortgage and the Lakeview Note bear the signature of Todd Phillips without any language as to his representative capacity for TPI.

6. The Lakeview Mortgage states that, "[t]his mortgage has been executed by the Mortgagor. . . for the purpose of securing Mortgagor's Indebtedness that may now be existing or that may arise in the future. . . ." (Bank Ex. 27)

7. In the "Collateral" section, the Lakeview Note states, [t]his Note is secured by Real Estate Collateral. In particular, this Note is secured by a Multiple Indebtedness Mortgage [the Lakeview Mortgage] dated October 28, 2005, to [the Bank] on real property described as [the Lakeview Property] and [the Riverwalk Property]. Collateral securing other loans with [the Bank] may also secure this Note as the result of cross-collateralization." (Bank Ex. 28)

8. The Bank's Senior Vice President and representative at Trial, Michael Prenger ("Mr. Prenger"), was the Bank's officer involved in each of the loans pertinent to this Adversary. (Prenger's testimony)

9. The Briggses chose Mahony Title and Land Services, LLC ("Mahony") to handle the Riverwalk Closing. (Joint Ex. 26)

10. Mr. Prenger was out of town at the time of the Riverwalk Closing. (Prenger's testimony)

11. Mahony requested the loan payoff on the Riverwalk Property from the Bank, and the Bank supplied Mahony with the figure $799,014.12. (Joint Exs. 30, 31)

12. Blake Harveston, a staff attorney for Mahony, performed the title search on the Riverwalk Property in connection with the Riverwalk Closing. (Joint Ex. 30)

13. Blake Harveston's search of the land records found only one mortgage on the Riverwalk Property, which mortgage was reflected on the HUD-1 settlement statement used at the Riverwalk Closing. (Bank Ex. 13, Joint Ex. 30)

14. At the time of the Riverwalk Closing, Todd Phillips was aware that there were three loans secured by the Riverwalk Property, but that two of those loans were cross-collateralized with the Lakeview Property. (Joint Ex. 26)[5]

15. Shelly Phillips's role in her marriage to Todd Phillips was to take care of the family's home and children. She did not pay any of the household bills or any of TPI's bills. (Shelly Phillips's testimony)

16. At the time of the Riverwalk Closing, Shelly Phillips did not know how much money had been paid by Todd Phillips or TPI toward the Riverwalk Loan, the Business Loan, or the Lakeview Loan. (Shelly Phillips's testimony)

17. At the time of the Riverwalk Closing, Shelly Phillips did not know that the payoff amount given to Mahony by the Bank would not satisfy the Riverwalk Loan and the Business Loan. (Shelly Phillips's testimony)

---

[5] Todd Phillips testified by deposition pursuant to an agreement worked out by the parties at the beginning of Trial. At the time of Trial, Todd Phillips was incarcerated in the Oakdale Federal Correctional Facility. While Todd Phillips originally asked for and was granted an Order Directing Issuance of a Writ of Habeus Corpus ad Testificandum (Adv. Dkt. No. 51), the Court subsequently set aside that Order (Adv. Dkt. No. 53) upon the motion of Todd Phillips.

18. At the time of the Riverwalk Closing, Shelly Phillips believed that the check paid to the Bank from the Proceeds satisfied the relevant obligation. (Shelly Phillips's testimony)

19. Even after realizing its purported error with regard to the payoff amount, the Bank cancelled the Collateral Mortgage in the St. Tammany Parish land records on May 8, 2006, because it realized it had legal exposure from the Briggses and Mahony if it refused to file the cancellation. (Defendants' Ex. 22, Prenger's testimony)

20. After purchasing the McComb House, the balance of the Proceeds (approximately $720,000) was deposited into TPI's operating account and used to pay the bills of TPI. (Joint Ex. 26)

## Issue

At issue before the Court is whether the unsatisfied Business Loan debt is excepted from discharge under 11 U.S.C. § 523(a)(4) or (a)(6)[6], based the Phillipses' accepting the disbursement of $1,095,219.06 at the Riverwalk Closing, after satisfying the Riverwalk Loan but not the Business Loan.

## Discussion of the Relevant Law

### I. Sections 523(a)(4) and (a)(6) Exceptions to Discharge

Section 523(a) of the Bankruptcy Code provides exceptions to discharge, in pertinent part, as follows:

> (a) A discharge under section 727, . . . of this title does not discharge an individual from any debt –
>
> * * *

---

[6] Hereinafter all code sections refer to the United States Bankruptcy Code located at title 11 of the United States Code unless otherwise noted.

>    (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
>    * * *
>
>    (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a). The Fifth Circuit has held that "discharge exceptions are to be narrowly construed in favor of the debtor since the aim of the Bankruptcy Code is to give the debtor a fresh start. Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 602 (5th Cir. 1998) (*citing* Texas Lottery Commn v. Tran (In re Tran), 151 F.3d 339, 342 (5th Cir. 1998)); *see also* Lines v. Frederick, 400 U.S. 18, 19 (1970); Gleason v. Thaw, 236 U.S. 558, 562 (1915); 4 Collier on Bankruptcy, ¶ 523.05 at 523-20. Since the Bank is seeking to have its debt excepted from discharge, the Bank bears the burden of proof. Robertson v. Dennis (In re Dennis), 330 F.3d 696 (5th Cir. 2003); U.S. v. Bridges, 894 F.2d 108, 111 (5th Cir. 1990). The standard of proof in an action under § 523(a) is the "preponderance of the evidence" standard rather than the more rigorous "clear and convincing evidence" standard. Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991); *see also* RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292 (5th Cir. 1995).

    A.    Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code is "intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." Savage v. Port Louis Owners Association, Inc. (In re Savage), 333 Fed. Appx. 831, 835 (5th Cir. 2009) (internal citations omitted). "The term

'while acting in a fiduciary capacity' does not qualify the words 'embezzlement' or 'larceny.'" Id. (*citing* 4 Collier on Bankruptcy ¶ 523.10[2] at 523-76 (15th ed. rev.)). "Accordingly, the existence of a fiduciary relationship between the debtor and creditor is not necessary in order for a debt for embezzlement or larceny to be non-dischargeable." Id.

### 1. Fraud or defalcation while acting in a fiduciary capacity

The Fifth Circuit has held that,

> [c]onsistent with the principle that exceptions to discharge are to be narrowly construed, the concept of fiduciary under § 523(a)(4) is narrower than it is under general common law. Under § 523(a)(4), "fiduciary" is limited to instances involving express or technical trusts. The purported trustee's duties must, therefore, arise independent of any contractual obligation. The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong.

Tran, 151 F.3d at 342 (internal citations omitted). Statutory trusts can also create the type of fiduciary relationship contemplated by § 523(a)(4).[7]

### 2. Embezzlement or larceny

Under federal common law, "embezzlement" is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." Miller, 156 F.3d at 602. The Fifth Circuit has held, "[t]o meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property." Id. at 601-03. Similarly, under federal common law, "larceny" is "a felonious taking of another's

---

[7] The Bank does not appear to have asserted in pleadings that any indebtedness on the part of the Phillipses arose out of "fraud or defalcation while acting in a fiduciary capacity." Moreover, the evidence presented at Trial did not demonstrate the existence of any fiduciary duties on the part of the Phillipses. To the extent the Bank was requesting that the debt be deemed nondischargeable "for fraud or defalcation while acting in a fiduciary capacity," that request is denied.

personal property with intent to convert it or deprive the owner of same." In re Barrett, 156 B.R. 529, 533 n. 3 (Bankr. N.D.Tex. 1993).

In Davis v. Tomasek (In re Tomasek), 175 Fed. Appx. 662 (5th Cir. 2006), the Fifth Circuit dealt with a debtor's sale of secured property without paying off the secured creditor. In Tomasek, the creditors argued that the debt owed by the debtor, Tomasek, was nondischargeable because Tomasek has sold the collateral without paying off their secured interest. Tomasek argued that "even if he did sell secured property without paying off the secured party, those actions, at most amount[ed] to a breach of contract claim, which is not embezzlement or larceny." Id. at 667. The Fifth Circuit agreed and affirmed the bankruptcy court's ruling that the debt was dischargeable. Id.

### B. Section 523(a)(6)

Under § 523(a)(6), a plaintiff must establish three elements to render a pre-petition obligation nondischargeable: (1) injury by the debtor; (2) to another (or property of another); and (3) such injury was willful and malicious. The U.S. Supreme Court has held that "[t]he word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) (emphasis in original). Additionally, the Supreme Court has decided, "that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." Id. at 64.

The Fifth Circuit has interpreted § 523(a)(6) on a number of occasions since Kawaauhau. In Miller, the Fifth Circuit held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm." 156 F.3d at 606. The Miller court in defining "malicious" rejected that it meant an act without just cause or excuse. Id. at

605-606. Instead, it adopted the "implied malice standard" and defined "malicious" as an act done with the "actual intent to cause injury." Id. at 606. The court observed that this definition of "malicious" is synonymous with the definition of "willful." Id. Thus, it found the "treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is 'injury.'" Id.; *see also* Raspanti v. Keaty (In re Keaty), 397 F.3d 264, 270 (5th Cir. 2005).

In 2003, the Fifth Circuit found that the "test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." Williams v. IBEW Local 520 (In re Williams), 337 F.3d 504, 509 (5th Cir. 2003). S*ee also* Texas v. Walker, 142 F.3d 813, 823 (5th Cir.1998) (stating "for willfulness and malice to prevent discharge under Section 523(a)(6), the debtor must have intended the actual injury that resulted. . . . Intent to injure may be established by showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury.") (citing In re Delaney, 97 F.3d 800, 802 (5th Cir. 1996)).

In Walker, the Fifth Circuit held that "[n]either a claim for breach of contract nor the tort of conversion necessarily involves an intentional injury." Walker, 142 F.3d at 823 (citing Kawaauhau, 523 U.S. at 62 (a knowing breach of contract does not necessarily involve an intentional injury); National Union Fire Ins. Co. v. Care Flight Ambulance Serv., Inc., 18 F.3d 323, 325 (5th Cir. 1994) (conversion does not necessarily involve an intentional injury); In re Moody, 899 F.2d 383, 385 (5th Cir. 1990) (conversion does not necessarily involve an intentional injury)). In Walker, a professor at the University of Texas had converted professional fees that should have gone to the university

pursuant to his employment contract. Id. at 815. The Fifth Circuit held that the professor's act of conversion was not dispositive on whether he had committed a "willful and malicious injury" without evidence of the professor's intent. Id. at 824.

In Williams, the Fifth Circuit also held that a knowing breach of contract, absent evidence that the debtor's breach was intended to or substantially certain to cause the harm sustained by the creditor, did not make a debt nondischargeable. 337 F.3d at 504. In Williams, the debtor purposefully hired nonunion workers in violation of a collective bargaining agreement. Id. at 507. The union was awarded monetary damages in subsequent litigation. After the debtor filed bankruptcy, the union filed an adversary complaint seeking to have the debt for damages excepted from discharge under § 523(a)(6). Id. at 508. Based on the record which showed that Williams decided to hire nonunion electricians in an attempt to finish the construction project and save his business, rather than to harm the union, the Fifth Circuit found that "[although] Williams acted intentionally, he did not intend to injure the Union." Id. at 510. Additionally, the Fifth Circuit found that "[t]here [wa]s no indication in the record that Williams, by breaching the [collective bargaining agreement], was substantially certain the Union would sustain a blow to its prestige and its ability to uphold its contracts" – the only injury allegedly sustained by the union. Id. at 511.

**II.     Analysis**

This Adversary presents the case of a creditor aggressively trying to shift the blame for its own actions onto the debtors. Upon realizing its failure to collect funds it could have collected to satisfy multiple loans, the Bank asserts that the remaining unsatisfied Business Loan debt is nondischargeable. The Bank, however, did not bear its burden to show that the unsatisfied Business

Loan debt is nondischargeable under § 523(a)(4) or (a)(6). In fact, the Bank failed to demonstrate any wrongful intent or malfeasance on the part of the Phillipses at all.

The Bank's counsel argued at Trial that the Phillipses' bad intent can be inferred from the following facts: (1) the Phillipses knew they had taken out more than one loan from the Bank; (2) they knew the loans totaled more than $1,000,000; (3) they knew that the distribution to the Bank at the Riverwalk Closing was less than $1,000,000; (4) they used $375,000 from the Proceeds to buy the McComb House; and, (5) they later deeded the McComb House to Todd Phillips's mother. The Bank's attempt to bootstrap these facts into evidence of a nefarious intent on the part of the Phillipses, however, fails in the context of the facts developed in the Bank's case-in-chief.

The facts show that at the time of the Riverwalk Closing, Todd Phillips, Shelly Phillips, and TPI, through Todd Phillips, had three loans with the Bank, each of which were secured by both the Riverwalk Property and the Lakeview Property through cross-collateralization clauses. While Mr. Prenger testified that he thought the money from the Business Loan went toward the completion of the construction on the Riverwalk Property, his testimony contradicts the Business Loan Agreement itself which states that the purpose of the Business Loan was "operating capital" and that the loan proceeds shall be used "solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing." *See* Bank Ex. 7.

Had the Bank wanted to memorialize that the Phillipses were borrowing additional money to complete construction on the Riverwalk Property, as Mr. Prenger claims, the Bank could have used different documentation like that used for the Riverwalk Loan, and made appropriate filings in the land records of St. Tammany Parish. In that scenario, for example, Mahony would have been able to find a second filing on the Riverwalk Property reflected in the St. Tammany Parish land

records. Had the Bank taken adequate steps in its bank records to reflect the cross-collateralization between the Business Loan and the Riverwalk Loan, the Bank would likely have increased the chances that it would have given Mahony the payoff amount it now wishes it had collected from the Proceeds of the Riverwalk Closing.

Instead, the Bank, through Mr. Prenger, memorialized the second loan to the Phillipses with a Business Loan Agreement. Furthermore, the Bank did not record any document related to the Riverwalk Property in the land records of St. Tammany Parish after the Business Loan was made. Presumably, the Bank, a sophisticated lender, had its reasons for documenting the $303,000 loan to the Phillipses as a Business Loan and not a personal or construction loan, though those reasons were not disclosed by the Bank.

In choosing the documentation for the Business Loan, both internally and in the St. Tammany Parish land records, the Bank created the vehicle for its own "mistake." Based on the Bank's treatment of the loans, the Bank apparently had no reliable mechanism, other than the knowledge of Mr. Prenger as the Bank officer on the loans to the Phillipses and TPI, by which to tie the two loans together when Mahony asked for the payoff amount on the Riverwalk Property. Because Mr. Prenger was out of town at the time of the Riverwalk Closing, the Bank provided Mahony the payoff amount of $799,014.12 to satisfy the Riverwalk Loan instead of the payoff amount of $1,112,931.60 ($799.014.12 to satisfy the Riverwalk Loan plus $313,117.50 to cover the Business Loan).

The Bank's own actions in cross-collateralizing all the pertinent loans created a situation in which it was as least as reasonable for the Phillipses to think that the Bank was looking to the Lakeview Property as security for the Business Loan as it would have been for the Phillipses to think the Bank had given Mahony the wrong payoff amount. Because the Bank failed to introduce any

evidence regarding the value of the Lakeview Property, this Court has no information on which to determine whether the Lakeview Property adequately secured the Business Loan and the Lakeview Loan. Accordingly, the Bank has failed to prove that it sustained any actual injury at all. If the Bank did suffer any injury, it was surely self-inflicted.

The assertion that the Phillipses' alleged nefarious intent can be inferred from the fact that the Phillipses bought the McComb House the same day as the Riverwalk Closing unconvincing at best. It is not unusual for homeowners to purchase a house with the sales proceeds from the sale of a previous house. Additionally, it is not unusual for homeowners to sell one house and purchase another house in the same day. Likewise, the Phillipses' decision to deed the house to Todd Phillips's mother also does not indicate bad intent necessarily. In his deposition, Todd Phillips testified that the reason they deeded the McComb House to his mother was because she had loaned them "a great deal of money for income and criminal attorney's fees." (Joint Ex. 26) Nothing about these facts suggests that the Phillipses intended or acted to deprive the Bank of its property.

Moreover, the Bank seems unwilling to acknowledge the fundamental incongruities in its argument. While it argues vehemently that the Phillipses should have satisfied the Business Loan with the Proceeds from the Riverwalk Closing, it makes no such argument regarding the Lakeview Loan, even though the Lakeview Loan was also collateralized with the Riverwalk Property. The Bank also seemed unwilling to acknowledge that the Proceeds from the Riverwalk Closing were sufficient to satisfy the Riverwalk Loan, the Business Loan, the Lakeview Loan, purchase of the McComb House outright, with additional proceeds to capitalize TPI operations.[8] The only reason

---

[8] The Riverwalk Loan was satisfied from the Proceeds before money was distributed to the Phillipses. The distribution to the Phillipses at the Riverwalk Closing was $1,095,219. The sum of the Business Loan ($313,117), the Lakeview Loan ($356,000), and the purchase price of the McComb House ($375,000) is $1,044,117, leaving $51,102 to capitalize TPI.

the Bank did not receive satisfaction for the Business Loan and the Lakeview Loan from the Proceeds of the Riverwalk Closing is because the Bank did not ask that those loans be satisfied from those Proceeds. Clearly whatever injury the Bank has suffered, if any, resulted from its own actions.

### A. The Bank failed to prove that the debt is nondischargeable under § 523(a)(4)

The Bank's assertion that the Phillipses's failure to satisfy the Business Loan with the Proceeds from the Riverwalk Closing amounted to embezzlement or larceny is not supported by Fifth Circuit caselaw. In Tomasek, the Fifth Circuit agreed with the debtor that his failure to pay off the secured creditor with the sales proceeds from the collateral at most amounted to a breach of contract, but not embezzlement or larceny. 175 Fed. Appx. at 667. In this Adversary, that same conclusion is also supported by the following facts: (1) the Bank was the very entity that provided Mahony with the payoff amount of $799,014.12 for the Riverwalk Closing; (2) the Phillipses and TPI had multiple cross-collateralized loans with the Bank; (3) before the Riverwalk Closing, the Business Loan was secured by the Lakeview Property in addition to the Riverwalk Property; and (4) after the Riverwalk Closing, the Business Loan was secured by the Lakeview Property.

Todd Phillips testified that he was aware of the cross-collateralization at the time of the Riverwalk Closing. (Joint Ex. 26) Based on the cross-collateralization, it was entirely reasonable at the time of the Riverwalk Closing for Todd Phillips to believe that the Bank would continue to look to the Lakeview Property, commercial property, as collateral securing the Business Loan after the Riverwalk Closing. Moreover, the Bank failed to show any wrongful or fraudulent intent on the part of Todd Phillips to deprive the Bank of its property. Accordingly, the Bank has failed to show the requisite intent on the part of Todd Phillips to render the unsatisfied Business Loan debt nondischargeable as to him under § 523(a)(4).

Shelly Phillips testified that she did not participate in paying the household or TPI bills. Her testimony made clear that at the time of the Riverwalk Closing, she had no information on how many payments or in what amounts Todd Phillips or TPI had made on any of the loans with the Bank. It was reasonable that Shelly Phillips relied on the payoff amount the Bank gave to Mahony for the Riverwalk Closing under the circumstances. Moreover, the Bank failed to show any wrongful intent on the part of Shelly Phillips as well to deprive the Bank of its property. Accordingly, the Bank likewise has failed to show the requisite intent on the part of Shelly Phillips to render the unsatisfied Business Loan debt nondischargeable as to her under § 523(a)(4).

**B.    The Bank failed to show that the debt is nondischargeable under § 523(a)(6)**

### 1. The Bank's Injury

The Bank asserts that it has been damaged because the Business Loan was not satisfied with Proceeds from the Riverwalk Closing. The Bank, however, failed to illustrate how it was injured by any act of the Phillipses. The credible evidence showed that the Bank controlled the payoff amount it provided to Mahony for the Riverwalk Closing. Moreover, when the Bank discovered its purported mistake, it decided to release the Riverwalk Property and cancel the Collateral Mortgage, notwithstanding the fact it had not collected adequate funds to satisfy the Business Loan, because the Bank realized the exposure to litigation from the Briggses and Mahony created by its actions. (Prenger's testimony)  The Bank, therefore, made a business decision to release some of the collateral securing the Business Loan. (Phillips Ex. 22) Additionally, the evidence demonstrated that, after the Riverwalk Closing, the Bank still held a security interest in the Lakeview Property as collateral for the Business Loan. Accordingly, the Bank failed to demonstrate that it was injured with regard to the Business Loan by any act of the Phillipses.

### 2. Subjective Motive to Cause Harm

In the event the Bank did adequately prove injury by the Phillipses, it failed to show any subjective motive to harm the Bank on the part of the Phillipses. At the Riverwalk Closing, the Phillipses relied on the accuracy of the payoff amount the Bank gave to Mahony. As discussed previously, Todd Phillips testified in his deposition that he was aware of the cross-collateralization at the time of the Riverwalk Closing. Shelly Phillips testified that she believed that the Bank was paid in full at the time of the Riverwalk Closing. Neither of the Phillipses gave any indication of any intent to cause harm to the Bank. Accordingly, the Bank has failed to show that the unsatisfied Business Loan debt should be excepted from discharge based on a subjective motive to cause harm.

### 3. Objective Substantial Certainty of Harm

Likewise, in the event the Bank did adequately prove injury by the Phillipses, it failed to show that any actions by the Phillipses met the "objective substantial certainty of harm" test. Because the Bank still held a security interest in the Lakeview Property as collateral for the Business Loan after the Riverwalk Closing, there was no objective substantial certainty of harm to the Bank when the Phillipses used their distribution from the Riverwalk Closing to purchase the McComb House and capitalize TPI. Accordingly, the Bank has failed to show that the unsatisfied Business Loan debt should be excepted from discharge based on the "objective substantial certainty of harm" test.

### Conclusion

Based on the foregoing, the Court finds that the Bank has failed to prove that it was injured by any actions of the Phillipses. If the Bank suffered injury, it resulted from acts of its own employees. Furthermore, the Bank failed to show any malfeasance on the part of either Todd

Phillips or Shelly Phillips. Accordingly, the Court found that the Phillipses' *ore tenus* Motion to Dismiss Adversary Complaint, made at the closing of the Bank's case-in-chief, was well-taken and granted.

The Court further finds that the Bank's Adversary Complaint should be dismissed with prejudice. A separate order consistent with this opinion will be entered in accordance with F.R.B.P. 7054 and 9021.

/s/ Neil P. Olack
Neil P. Olack
United States Bankruptcy Judge
Dated: December 8, 2010